Argued December 5, 1977, affirmed March 7, rehearing denied
April 11, 1978

PIO, *Respondent,*
*v.*
ROSS B. HAMMOND CO., INC., *Appellant.*
(TC 408-020, SC 25050)
576 P2d 341

William B. Wyllie, Salem, argued the cause and filed a brief for appellant.

Thomas A. Caruso, Portland, argued the cause for respondent. With him on the brief were Paul T. Bailey, Bailey, Welch, Bruun & Green.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, and Linde, Justices.

LINDE, J.

## LINDE, J.

Defendant, a general construction contractor, is a party to a master labor agreement negotiated between councils of the United Brotherhood of Carpenters and Joiners of America and several associations of general contractors in Oregon and Southwest Washington. The master agreement contains a clause governing the subcontracting of work covered by the agreement to subcontractors who are not themselves signatories to the agreement. It provides that a general contractor either must require such a subcontractor to bind himself to the terms of the master agreement or the contractor must assume responsibility for payment of these employees' wages and fringe benefits under the agreement.[1] The validity of this subcontracting clause was challenged in *Schlecht v. Walsh,* 273 Or 221, 540 P2d 1011 (1975), upon a claim that it required a contractor to make payments to union trust funds for the benefit of others than his own employees, contrary to 29 USC § 186. This court's construction of the master agreement was sustained by the United States Supreme Court in *Walsh v. Schlecht,* 429 US 401 (1977). The Court held that the payments into union trust funds required by the agreement were not for the benefit of the nonsignatory subcontractor's employees but solely for the benefit of the employees of signatory

---

[1] Article IV of the agreement provides in part:

If an employer, bound by this Agreement, contracts or subcontracts, any work covered by this Agreement to be done at the job site of the construction, alteration or repair of a building, structure, or other work to any person or proprietor who is not signatory to this Agreement, the employer shall require such subcontractor to be bound to all the provisions of this Agreement, or such employer shall maintain daily records of the subcontractors employees job site hours, and be liable for payment of these employees wages, travel, Health-Welfare and Dental, Pension, Vacation and Apprenticeship contributions in accordance with this Agreement.

Three versions of the agreement covering three different time periods were admitted as evidence in this proceeding. The 1968-71 version used the term "contractor" instead of "employer" throughout the document; the 1968-71 and 1971-73 agreements also contained a Construction Industry Advancement Fund contribution provision in article IV.

employers, and that they were therefore authorized by 29 USC § 186(c) (5) and (6).

In the present suit for an accounting, brought by plaintiff as assignee for trustees of the several union trust funds involved, the same subcontracting clause faces a different challenge. Defendant resists payments required by the clause with respect to work done by the employees of nonsignatory subcontractors on the ground that this requirement, coupled with the subcontractors' obligation on projects covered by the Davis-Bacon Act[2] to pay equivalent sums to their own employees, adds up to a "double payment" of the fringe benefits that prevents the economic use of nonsignatory subcontractors on such projects and therefore contravenes sections 1 and 2 of the Sherman Act.[3] The trial court sustained plaintiff's demurrer to this affirmative defense, and defendant appeals.

The antitrust defense to this labor agreement raises the issue how the subcontracting clause fares under the policies stated in *Connell Construction Co. v. Plumbers Local 100,* 421 US 616 (1975), the United States Supreme Court's latest pronouncement on the relationship between the federal antitrust and labor laws. That relationship has long, and unavoidably, been a difficult one, because the labor laws represent a national policy to permit workers to organize and contract against cost competition in labor standards, while the antitrust laws forbid actions designed to restrict competitive access to any relevant market for

---

[2]The Davis-Bacon Act, 40 USC § 276(a) et seq. (1970), requires payment of the wage rates prevailing in the locality on all construction projects to which the United States is a party.

Although defendant resists payments for work done by a number of nonsignatory subcontractors, it only claims that one of these subcontractors worked on a project covered by the Davis-Bacon Act.

[3]15 USC §§ 1-2 (Supp V 1975). Section 1 prohibits contracts "in restraint of trade or commerce among the several States"; section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

goods or services.[4] Beyond this, the National Labor Relations Act (NLRA) itself denies unions certain indirect or "secondary" methods of gaining their objectives from one employer by pressures upon another enterprise. NLRA §§ 8(b) (4) and 8(e); 29 USC § 158(b) (4) and (e) (1970). In section 8(e), however, which makes it an unfair labor practice for a union and any employer to agree that the employer will not deal with another person or handle another employer's products, Congress provided a special exemption for agreements concerning the subcontracting of work at a construction site.[5] The interrelation of this construction industry proviso and the antitrust law was before the Court in *Connell* and also concerns us here.

In *Connell* a local union, by picketing a general contractor who normally subcontracted work by competitive bidding, obtained the contractor's agreement to subcontract work only to firms that had a current contract with the union. The union did not represent or seek to represent the general contractor's own employees. Of course the intended and actual effect of the agreement was to exclude all subcontractors who did not have contracts with the local union (though perhaps with other unions) from Connell's construction projects. The Supreme Court found the anticom-

---

[4] A recent review of the evolution of the Supreme Court's efforts to accommodate the national antitrust and labor laws is contained in St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law*, 62 Va L Rev 603 (1976).

[5] 29 USC § 158(e) (1970) provides in part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work. . . .

[ 521 ]

petitive effect of the agreement enhanced by two factors. One was that a multiemployer contract between the union and the local mechanical contractors' association contained a so-called "most favored nation" clause which guaranteed each contracting employer the benefit of any union concession to any other employer, and which would "eliminate competition on all subjects covered by the multiemployer agreement, even on subjects unrelated to wages, hours, and working conditions," though the Court did not state what these subjects might be. The second factor was that the subcontracting clause obtained from general contractors like Connell gave the union complete control over access to the market for such subcontracting work by refusing to sign agreements with new or "outside" employers. 421 US at 623-624. The Court concluded that the control thus created by agreement with the general contractors allowed a "direct restraint on the business market . . . that would not follow naturally from the elimination of competition over wages and working conditions," analogous to the closed market that was held to violate the Sherman Act in *Allen Bradley Co. v. Local 3, IBEW,* 325 US 797 (1945). 421 US at 625. Finally, the Court held that the clause restricting subcontract work to employers organized by the local union was not a legitimate organizing device privileged by the construction industry proviso of section 8(e), *supra* note 5. 421 US at 626-633.

■ Defendant in the present case contends that the subcontracting clause in the master labor agreement, by requiring "double payment" of fringe benefits when a nonunion subcontractor is used on a construction project covered by the Davis-Bacon Act, has the same effect of excluding nonunion subcontractors as the express provision that was condemned in *Connell.* Plaintiff, on the other hand, contends that the subcontracting clause in this case is privileged under section 8(e) because, unlike that in *Connell,* it is part of a

collective bargaining agreement with the prime contractor.

If the decision depends merely on matching facts, this case is easy to distinguish from *Connell.* However, surface similarities or differences between the cases do not necessarily correspond to the divergent elements of congressional policy that *Connell* and its predecessors seek to accommodate.

It is not clear, for instance, that the subcontracting clause is immune from attack merely because this union is the collective bargaining agent for the general contractor's employees. On that issue, plaintiff urges upon us a paragraph from *Connell* as if that opinion had placed it "beyond argument" that the clause would be exempt from antitrust law if it were a part of a collective bargaining agreement. The paragraph actually states:

> There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement. Cf. *Mine Workers v. Pennington,* 381 U. S., at 664-665; *Jewel Tea,* 381 U. S., at 689-690 (opinion of White, J.); *id.,* at 709-713, 732-733 (opinion of Goldberg, J.). In this case, Local 100 had no interest in representing Connell's employees. The federal policy favoring collective bargaining therefore can offer no shelter for the union's coercive action against Connell or its campaign to exclude nonunion firms from the subcontracting market. 421 US at 625-626.

To say that an argument is not available on the facts, "whatever its force in other contexts," hardly says much for its conclusiveness where it is available. In fact, the *Pennington* decision there cited by the *Connell* Court found no antitrust immunity for certain arrangements that *were* part of a collective bargaining agreement between the United Mine Workers and major coal producers to the detriment of other competitive producers. The main focus of the Supreme Court's attention in *Pennington* and its companion,

*Jewel Tea,*[6] was the question whether agreements on matters that the NLRA makes mandatory subjects of collective bargaining[7] could be attacked under the antitrust laws. On this question, the *Pennington* majority wrote:

We think it beyond question that a union may conclude a wage agreement with the multi-employer bargaining unit without violating the antitrust laws and that it may as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek the same wages from other employers.

This is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining, regardless of the subject or the form and content of the

[6] *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 US 676 (1965).

In *Pennington* a coal mine operator resisted payments into a trust fund established under a 1950 agreement between the United Mine Workers and the major coal mine operators in which the UMW agreed to accept mechanization of the mines and to abandon other traditional objectives in return for a rising wage scale and increased royalty payments into a union welfare fund. The Supreme Court held that a claim under the Sherman Act had been made out by the protesting operator's allegations that the union and the large operators had agreed to reduce overproduction of coal by eliminating smaller companies, that the terms of the agreement were to be imposed on all operators, that the signatory companies would not lease coal lands to nonunion operators, and (later) that they would not sell or buy coal to or from such companies. 381 US at 660.

In *Jewel Tea* an unsuccessful antitrust attack was leveled against an agreement between the union and a trade association that limited the hours when retail stores could sell fresh meat. There was no opinion for the Court, but Justice White, who wrote for the Court in *Pennington,* distinguished that case because there was evidence that the restraint on night sales was intimately related to the butchers' hours and working conditions, a mandatory subject of collective bargaining under 29 USC 158(d), rather than an effort to restrict the "self-service" market in meat.

[7] 29 USC § 158(d) (1970) provides in part:

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . .

agreement. . . . But there are limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean [*sic*] that the agreement reached may disregard other laws. [Citations.]

We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior. But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. *UMW v. Pennington,* 381 US 657, 664-665 (1965).

The opinion continued by stating that "there is nothing in the labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire industry," and that, to the contrary, "the duty to bargain unit by unit leads to a quite different conclusion." *Id.* at 666. On the other hand, Justice Goldberg, whose opinion is also cited in the *Connell* paragraph, above, believed that "Congress intended to foreclose judges and juries from making essentially economic judgments in antitrust actions by determining whether unions or employers had good or bad motives for their agreements on subjects of mandatory bargaining." *Id.* at 719. Moreover, the quoted paragraph in *Connell* refers to provisions included in a "lawful" collective bargaining agreement, which seems to beg the question unless "lawful" refers only to labor law rather than antitrust criteria. We think the most that can be said for the paragraph is that it leaves the significance of inclusion in a collective bargaining agreement open.

Unlike *Pennington* and *Jewel Tea,* however, *Connell* and the present case arise in the construction industry and therefore involve the effect of the proviso

made for that industry in section 8(e) of the NLRA, *supra* note 5. On its face, the proviso only exempts an agreement within its terms from being an unfair labor practice under that subsection. But it seems conceded on all sides that the proviso represents a broader Congressional policy to "allow" or "authorize" certain agreements in the construction industry, and part III of the *Connell* opinion proceeds on the implicit premise that an agreement "allowed" by the proviso would be exempt also from the Sherman Act. 421 US at 626-633.[8]

The *Connell* Court found the agreement restricting subcontracts to employers who had contracts with the union to go beyond the exemption from section 8(e) allowed by the construction industry proviso. It reached that result because the subcontracting agreement obtained from Connell was not designed so as to protect union members from having to work alongside nonunion workers on the jobsite (a recognized purpose of the proviso) but rather used a "stranger" general contractor to "give construction unions an almost unlimited organizational weapon" for " 'top-down' organizing campaigns." 421 US at 631-632. Deprived of the construction industry exemption, the agreement clearly violated section 8(e). If that is so, the fact that the present agreement imposes the terms of the master agreement on subcontracted work only at construction jobsites, a setting which Congress thought appropriate for distinct treatment, may be important in avoiding the strictures of *Pennington* against making contracts for other bargaining units. In any event, defendant in this case in fact does not invoke that doctrine of *Pennington.*

---

[8] *Connell* is not really a holding on the point, since the Court found the agreement in that case to go beyond the proviso. The legislative history supporting the position that Congress rejected use of the antitrust laws against union "secondary" activities is reviewed by the dissenters in *Connell,* 421 US at 639-655. But their view of the labor exemption from the antitrust laws extended to forbidden practices as well as to those exempt from section 8(e).

The subcontracting clause in the present agreement differs substantially from that in *Connell.* It is not apparent on its face that it would violate section 8(e) even apart from the construction industry proviso. Far from binding the prime contractor not to deal with any class of subcontractors, the clause is written precisely for the situation in which a subcontractor on a construction job is not a party to the master labor agreement. It purports only to protect the labor standards set in the master agreement by holding the prime contractor responsible for maintaining these standards when a subcontractor has not already signed the agreement.[9] *A fortiori,* the subcontracting clause is permissible in the construction industry unless it is in fact employed for a purpose or in a manner condemned in *Connell.*

---

[9] A federal court of appeals considered the present clause valid as being "less coercive" than a clause disqualifying any subcontractor who was delinquent in payments to similar trust funds, which the court invalidated under section 8(e). *See Griffith Co. v. NLRB,* 545 F2d 1194, 1203 n. 14 (9th Cir 1976), *cert. denied,* 98 S Ct 171 (1977).

The provision might also be described as a "union standards" clause like the clause sustained against section 8(e) in *Truck Drivers Local 413 v. NLRB,* 334 F2d 539, 548 (DC Cir), *cert. denied,* 379 US 916 (1964). The Court of Appeals there wrote:

> This Board position groups together, as secondary, contract clauses which impose boycotts on subcontractors not signatory to union agreements, and those which merely require subcontractors to meet the equivalent of union standards in order to protect the work standards of the employees of the contracting employer. But the distinction between these two types of clauses is vital. Union-signatory subcontracting clauses are secondary, and therefore within the scope of § 8(e), while union-standards subcontracting clauses are primary as to the contracting employer. [Citations.]

> This clause would be a union-signatory clause if it required subcontractors to have collective bargaining agreements with petitioner unions or their affiliates, or with unions generally. We interpret it, however, as merely requiring that subcontractors observe the equivalent of union wages, hours, and the like. Since we find that this clause only requires union standards, and not union recognition, we follow the line of cases in this court cited above to rule it primary, and thus outside § 8(e)'s prohibitions.

The concept of a "union standards" subcontracting clause has been approved in federal cases since *Pennington. See, e.g., NLRB v. National Maritime Union,* 486 F2d 907, 912 (2d Cir 1973), *cert. denied,* 416 US 970 (1974).

The precise allegation of the affirmative defense to which the demurrer was sustained was that the subcontracting clause violated the Sherman Act "because its purpose, intent and affect [*sic*] was to require defendant to require its subcontractors to become signatories to the Carpenters Labor Agreements mentioned in paragraph IV of the First Cause of Suit." Paragraph IV of the first cause of suit merely refers to the series of master labor agreements between the union and the multiemployer association between 1968 and 1976. The affirmative defense did not allege that any other clause of these agreements itself violated the Sherman Act. It did not claim a design of the union and the employers' association to restrict the construction market or to exclude any contractors or subcontractors from it. Even though it claimed that the subcontracting clause in purpose and effect bound the prime contractor to require its subcontractors to sign the master agreement (rather than paying the contract benefits itself, as allowed on the face of the clause), the quoted defense did not allege that the union or the association would have any control over the right of any subcontractor to do so. In terms, the clause only contemplates that a subcontractor will agree with the prime contractor to "be bound to all the provisions" of the master agreement, not that it must obtain a contract from the union. *See* note 1 *supra*.[10]

Nor did the defense allege any other anticompetitive purpose or anticompetitive effect "that would not follow naturally from the elimination of the competition over wages and working conditions," *Connell, supra,* 421 US at 625, assuming that those terms are broad enough to include the fringe benefits involved here. Indeed, defendant's argument is not so much that the subcontracting clause purposely eliminated

---

[10]In these respects the subcontracting clause, both as written and as challenged in defendant's allegations, differs from the clauses held vulnerable under the Sherman Act in *Morse Bros. v. Operating Engineers Local 701,* Civil No. 71-515 (D Or Oct 3, 1974).

nonunion employers from subcontracts under the master agreement as, rather, that this effect occurs by virtue of the Davis-Bacon Act on projects covered by that Act. But the Davis-Bacon Act is itself an "anticompetitive" congressional policy placing the maintenance of prevailing wage standards on government projects above the advantages of price competition based on lower standards. When congressional policy simultaneously (1) encourages employers and workers collectively to agree on economic terms, including trust funds for the future benefit of the workers, and (2) allows protection of these economic benefits by their contractual extension also to subcontracted work, at least in the construction industry, and (3) also prescribes that nonunion workers on government construction projects be paid the equivalent of these nonwage benefits in cash, the combined effect of these policies on the use of nonunion subcontractors on government construction projects cannot reasonably be charged to a violation by the parties of a more general congressional policy against restraints of trade. We affirm the ruling of the trial court that the mere allegation that the agreement would require subcontractors to become signatories to the master agreement, without more, did not state a defense under the Sherman Act.

■ Defendant also appeals the award of attorney fees under clauses of the trust fund agreement between the union and the contractors associations.[11] The trial court set these fees at $6,439.20 upon an affidavit of plaintiff's attorney showing a total of 150.92 hours

---

[11] A typical clause in one of these trust fund agreements provides:

If any individual employer defaults in the making of such payments and if the Board consults legal counsel with respect thereto, or files any suit or claim with respect thereto, there shall be added to the obligation of the employer who is in default, reasonable attorney's fees, court costs and all other reasonable expenses incurred by the Board in connection with such suit or claim, including any and all appellate proceedings therein.

The attorney fees apparently were allocated to the various funds proportionately to the amounts recovered by each fund.

devoted to the case. Defendant made no objection to the evidence that this time was spent, but he asks us to reduce the sum as excessive because the trial lasted only one day and involved only $3,900.

Defendant recognizes that these factors are not conclusive. This litigation was begun in October 1974 and went through a series of motions, pleadings, and amended pleadings at the instance of one side and the other before coming to trial in August 1975, after which further proceedings continued until the final decree of December 1976. Moreover, the challenged validity of the subcontracting clause of this region-wide master labor agreement is an issue of much wider importance than the particular $3,900 claimed in this suit. We decline to disturb the trial court's award of attorney fees.

Costs to neither party in this court.

Affirmed.